IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

DARRYL HILL,                        )
                                    )
            Plaintiff,              )
                                    )
      v.                            ) Case No.
                                    ) 07-0937-CV-W-REL-SSA
MICHAEL J. ASTRUE, Commissioner     )
of Social Security,                 )
                                    )
            Defendant.              )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Darryl Hill seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Title II of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in failing to make a finding regarding plaintiff's nonexertional impairments (specifically, pain, limited vision, and shortness of breath) and in failing to utilize the services of a vocational expert. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

*I.* **BACKGROUND**

On February 7, 2005, plaintiff applied for disability benefits alleging that he had been disabled since June 24, 2004. Plaintiff's application was denied on March 30, 2005. On April 11, 2007, a hearing was held before an Administrative Law Judge.

On June 13, 2007, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On October 19, 2007, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v.

2

<u>Securities & Exchange Commission</u>, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. at 401; <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." <u>Id</u>.; <u>Clarke v. Bowen</u>, 843 F.2d 271, 272-73 (8th Cir. 1988).

**III. *BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS***

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. <u>Nevland v. Apfel</u>, 204 F.3d 853, 857 (8th Cir. 2000); <u>Brock v. Apfel</u>, 118 F. Supp. 2d 974 (W.D. Mo.

3

2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.   Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.   Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.   Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.   Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.   Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

4

## IV. THE RECORD

The record consists of the testimony of plaintiff and documentary evidence admitted at the hearing.

## A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

## Earnings Record

The record shows that plaintiff earned the following income from 1978 through 2006:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1978 | $ 1,534.05 | 1993 | $34,020.67 |
| 1979 | 1,685.80 | 1994 | 35,429.23 |
| 1980 | 1,405.40 | 1995 | 27,466.47 |
| 1981 | 662.30 | 1996 | 26,431.63 |
| 1982 | 4,815.16 | 1997 | 31,163.86 |
| 1983 | 8,172.56 | 1998 | 38,741.78 |
| 1984 | 13,124.54 | 1999 | 32,196.68 |
| 1985 | 12,184.89 | 2000 | 31,974.70 |
| 1986 | 15,500.05 | 2001 | 27,184.37 |
| 1987 | 15,738.95 | 2002 | 3,542.78 |
| 1988 | 24,510.28 | 2003 | 5,807.09 |
| 1989 | 30,428.21 | 2004 | 11,036.09 |
| 1990 | 32,723.50 | 2005 | 2,016.00 |
| 1991 | 32,737.04 | 2006 | 0.00 |
| 1992 | 33,275.60 | | |

(Tr. at 30-32).

Case 4:07-cv-00937-REL   Document 18   Filed 10/10/08   Page 5 of 33

**Disability Report**

In a Disability Report dated October 2, 2006, plaintiff reported that he is disabled due to "Myastinia [sic] gravis[1], diabetes, knee surgery" (Tr. at 40). Plaintiff reported that he stopped working "for shoulder and knee surgery, I just haven't went back" (Tr. at 41). Plaintiff reported that he has three years of college (Tr. at 46).

---

[1]The voluntary muscles of the entire body are controlled by nerve impulses that arise in the brain. These nerve impulses travel down the nerves to the place where the nerves meet the muscle fibers. Nerve fibers do not actually connect with muscle fiber; this space is called the neuromuscular junction. When the nerve impulse originating in the brain arrives at the nerve ending, it releases a chemical called acetylcholine. Acetyl-choline travels across the space to the muscle fiber side of the neuromuscular junction where it attaches to many receptor sites. The muscle contracts when enough of the receptor sites have been activated by the acetylcholine. In Myasthenia Gravis ("MG"), there is as much as an 80% reduction in the number of these receptor sites. The reduction in the number of receptor sites is caused by an antibody that destroys or blocks the receptor site. Antibodies are proteins that play an important role in the immune system. They are normally directed at foreign proteins called antigens that attack the body. Such foreign proteins include bacteria and viruses. Antibodies help the body to protect itself from these foreign proteins. For reasons not well understood, the immune system of the person with MG makes antibodies against the receptor sites of the neuromuscular junction. Abnormal antibodies can be measured in the blood of many people with MG. The anti-bodies destroy the receptor sites more rapidly than the body can replace them. Muscle weakness occurs when acetylcholine cannot activate enough receptor sites at the neuromuscular junction. Common symptoms can include a drooping eyelid, blurred or double vision, slurred speech, difficulty chewing and swallowing, weak-ness in the arms and legs, chronic muscle fatigue, and difficulty breathing.

Case 4:07-cv-00937-REL   Document 18   Filed 10/10/08   Page 6 of 33

**Function Report**

In a Function Report dated March 10, 2005, plaintiff described his daily activities as follows:

> Get up and get cleaned up. Feed and water dogs, feed fish. Take meds. Eat something, watch TV. Fix lunch. Watch TV. Clean around the house. Run errands with wife. Help with dinner. Clean kitchen, watch TV. Take meds. Eat. TV. Go to bed.

(Tr. at 65).

Plaintiff reported that it is hard to trim his beard due to double vision (Tr. at 66). Plaintiff prepared his own meals, and he makes complete meals (Tr. at 67). He can cook for one to two hours at a time, and he has had to make no changes in his cooking habits since the onset of his condition (Tr. at 67). Plaintiff does laundry, some household repairs, mowing, and dishes (Tr. at 67). Plaintiff goes out of his house once a day, either by walking, driving a car, or riding in a car (Tr. at 68). He is able to go out alone (Tr. at 68). He shops for groceries and household goods for 30 to 60 minutes every few days (Tr. at 68). He is able to pay bills and count change (Tr. at 68).

Plaintiff listed his hobbies as "sports, working, watching TV, reading, video games" (Tr. at 69). He no longer participates in sports, he works only a little, he sometimes reads, and he watches television and plays video games daily (Tr. at 69).

7

Plaintiff was asked if he has any problems getting along with family, friends, neighbors, or others, and he checked "no" (Tr at 70). However, in the next section, he was asked to circle all of the items his condition s affect, and he circled "getting along with others" (Tr. at 70). He also circled walking, but he did not circle standing or sitting (Tr. at 70). He reported that he could walk 1/2 mile to one mile before needing to rest (Tr. at 70). He is able to follow written and spoken instructions (Tr. at 70).

**B. *SUMMARY OF MEDICAL RECORDS***

On January 15, 2003, plaintiff's lab work showed that his cholesterol was high at 293 (normal is below 200), and his blood sugar was high at 216 (normal is 70 to 110) (Tr. at 108).

On April 22, 2003, plaintiff's lab work showed that his cholesterol was high at 329 (normal is below 200) (Tr. at 105). His Hemoglobin A1c was high at 9.6[2] (Tr. at 106). Plaintiff's

---

[2]The A1c test is used primarily to monitor the glucose control of diabetics over time. The goal of those with diabetes is to keep their blood glucose levels as close to normal as possible. This helps to minimize the complications caused by chronically elevated glucose levels, such as progressive damage to body organs like the kidneys, eyes, cardiovascular system, and nerves. The A1c test gives a picture of the average amount of glucose in the blood over the last few months. It can help a patient and his doctor know if the measures they are taking to control the patient's diabetes are successful or need to be adjusted. A 1% change in an A1c result reflects a change of about 30 mg/dL (1.67 mmol/L) in average blood glucose. For instance, an A1c of 6% corresponds to an average glucose of 135 mg/dL (7.5

blood sugar was high at 159 (normal is 70 to 100) (Tr. at 107).

On November 6, 2003, plaintiff saw Jack Uhrig, M.D., at Missouri Valley Physicians (Tr. at 92). "He has been out of his blood pressure medications for a while. He is needing to undergo a PT evaluation at work and needs a note to verify that he can proceed with this. He's had some knee and back pain and wants to see the chiropractor. He has not been very compliant with his meds otherwise." Plaintiff's blood pressure was 140/100. Dr. Uhrig ordered blood work. He assessed hypertension, not well controlled; diabetes mellitus, for which plaintiff was directed to increase his insulin; hyperlipidemia (elevated cholesterol), "he will restart his Zocor"; and myasthenia "stable" (see footnote 1). Plaintiff's blood work showed his Hemoglobin A1c was high at 10.6 (normal is 6.0) (Tr. at 104).

Plaintiff had blood work done on November 7, 2003 (Tr. at 102). His blood sugar was high at 206 (normal is 70 to 110), his cholesterol was high at 367 (normal is below 200), and his LDL cholesterol was high at 292.4 (normal is below 100). Someone circled both cholesterol numbers and wrote "off Zocor" which is a cholesterol lowering medication.

_____

mmol/L), while an A1c of 9% corresponds to an average glucose of 240 mg/dL (13.5 mmol/L). The closer diabetics can keep their A1c to 6%, the better their diabetes is in control. As the A1c increases, so does the risk of complications.

9

On January 5, 2004, plaintiff saw Dr. Uhrig (Tr. at 91).
Plaintiff's vision was 20/25 in his right eye, 20/20 in his left
eye, and 20/20 in both eyes, all with glasses.  The notes reflect
that plaintiff was applying for disability.  The form lists only
plaintiff's complaints and his social history.  There are no
notes of exam, no findings or assessments.

On February 6, 2004, plaintiff failed to show for his
appointment with Dr. Uhrig (Tr. at 93).

On February 13, 2004, plaintiff saw Dr. Uhrig (Tr. at 90,
93).  "He has felt fine, blood sugars have been much better
controlled since he is watching his diet better.  He is back
working again.  Back pain still bothers him.  No chest pain.
Does have occasional hypoglycemic episode."  Dr. Uhrig assessed
hypertension, doing much better; diabetes mellitus, also
improved; and hyperlipidemia, remains on Zocor.  His blood sugar
was normal at 109 (Tr. at 101).

On April 20, 2004, plaintiff saw Dr. Uhrig for a follow up
on hypertension, gastroesophageal reflux disease, and diabetes
(Tr. at 94).  "He has been off work since February.  His blood
sugars have gone back up.  He occasionally has hypoglycemic
episode.  No problems with his BP medicines.  He does complain of
some soreness of the right shoulder."  On range of motion,
plaintiff had some discomfort in his right shoulder.  Dr. Uhrig

10

prescribed Altace since plaintiff's blood pressure was still elevated (135/100). He also ordered blood work which showed that plaintiff's Hemoglobin A1c was high at 8.4 (normal is 6.0) (Tr. at 99). His blood sugar was also high at 179 (normal is 70 to 110) (Tr. at 100).

On May 3, 2004, plaintiff saw Dr. Uhrig (Tr. at 89). Plaintiff reported persistent low back and right shoulder pain. Dr. Uhrig ordered an MRI of plaintiff's right shoulder and lumbar spine.

On May 10, 2004, plaintiff had an MRI of his right shoulder (Tr. at 140). David Brummett, M.D., concluded "probable findings of tendinopathy [tendon injury] or possibly a partial tear involving the anterior-distal aspect of the supraspinatus tendon [top of the shoulder]. Probable small tear involving the superior aspect of the labrum[3]. Degenerative changes at the acromioclavicular joint [joint at the top of the shoulder]." Plaintiff also had an MRI of the lumbar spine (Tr. at 141). Dr. Brummett found degenerative changes with mild narrowing of the left neural foramen[4] with mild to moderate narrowing of the right neural foramen at L4/5. There was also mild bilateral neural

___

[3]A ring of fibrous cartilage around the edge of the joint surface of a bone.

[4]"Doorway" through which the spinal nerves leave the spinal canal to spread out into the body.

11

foramen narrowing at L5/S1.

On May 17, 2004, Dr. Uhrig referred plaintiff to an orthopaedic doctor for evaluation of his shoulder pain and abnormal MRI indicating rotator cuff tear (Tr. at 95).

On May 19, 2004, plaintiff saw Ronald Carter, M.D., at Columbia Orthopaedic Group (Tr. at 149-151). Plaintiff reported that he was unaware of any injury causing his shoulder pain. He complained of low back pain for the past 12 to 14 years. He complained of right knee pain since 1980 intermittently, worse with squatting or twisting. Dr. Carter reviewed plaintiff's MRI of his shoulder and back as well as x-rays of the knee and shoulder. He recommended arthroscopy of the shoulder and gave plaintiff samples of Bextra[5] and Mobic [non-steroidal anti-inflammatory]. . . . After his shoulder arthroscopy is done, he will probably need a knee arthroscopy at a later date . . . . This could be done two or three weeks after his shoulder surgery so he could still get back to work without delaying it unduly."

On June 22, 2004, plaintiff saw Dr. Uhrig (Tr. at 87). "He is scheduled for right shoulder surgery for rotator cuff tear and also surgery on his right knee for cartilage tear. He is working 40 hours per week. He is still having some back pain. He occasionally has some hypoglycemic [low blood sugar] episodes

---

[5]Bextra is a non-steroidal anti-inflammatory that was withdrawn from the U.S. market in 2005.

during work and has to cut back on his dose of insulin in the morning.  He is otherwise tolerating the Altace [treats high blood pressure].  No chest pain or SOB [shortness of breath]."  Dr. Uhrig assessed hypertension "doing much better", diabetes mellitus, and hyperlipidemia (elevated cholesterol). Dr. Uhrig ordered blood work, and plaintiff's Hemoglobin A1c game back high at 8.6 (normal is 6.0) (Tr. at 97).  His blood sugar was also high at 149 (normal is 70 to 110) (Tr. at 98).

June 24, 2004, is plaintiff's alleged onset date.  On that day, plaintiff saw Dr. Carter (Tr. at 149).  Dr. Carter wrote that plaintiff "is doing satisfactorily with his general condition[s] of myasthenia gravis, diabetes, and hypertension."  Plaintiff's shoulder was unchanged.  "We have him scheduled for arthroscopic surgery.  He understands that if we find the capsule or labrum torn from the glenoid rim and have to repair it or if there is a small full thickness tear of the rotator cuff we may have to repair back to bone, he would need to be immobilized.  If we do not have to repair tendon, cartilage or capsule to bone, we will not need to immobilize him and his rehab will be less involved.  We will give him the appropriate instructions postoperatively.  He understands that he will need three to four months of therapy, possibly longer depending upon the extent of injury found at the time of the surgery. . . .  We will proceed

13

with surgery this afternoon".

On July 7, 2004, plaintiff saw Dr. Carter and had the sutures removed from his shoulder (Tr. at 148).  "He has essentially full range of motion of his shoulder, but needs added strength."  Dr. Carter recommended "Phase III acromioplasty protocol.[6]  In three weeks they may progress him to Phase IV protocol."  Dr. Carter gave plaintiff limits for his shoulder for workers' compensation "but he probably won't be able to go back to work with limitations.  It may possibly be early September before we can release him from limits."

On July 12, 2004, plaintiff told his physical therapist he did not have much pain (Tr. at 125).  He completed an initial patient interview that day wherein he was asked to circle all of the symptoms he suffers (Tr. at 138).  He did not circle

---

[6]PHASE III – DYNAMICS STRENGTHENING PHASE
Advanced Strengthening Phase
Goals: Normalized Range of Motion; Improve Strength/Power/ Endurance; Improve Neuromuscular Control; Prepare Athlete to Begin to Throw, etc.; Symptom Free Normal Activities
Criteria to Enter Phase III
1. Full non-painful range of motion.
2. No pain or tenderness.
3. Strength 70% compared to contralateral side.
PHASE IV – RETURN TO ACTIVITY PHASE
Goals: Progressively increase activities to prepare patient for full functional return.
Criteria to Progress to Phase IV
1. Full range of motion.
2. No pain or tenderness.
3. Isokinetic Test that fulfills criteria to throw.
4. Satisfactory clinical exam.

14

shortness of breath.

On July 20, 2004, plaintiff saw Dr. Carter (Tr. at 147).
Plaintiff's range of motion in his shoulder was "<u>excellent</u>"
(emphasis in the original). "No written limits were needed by
the patient but I explained limits to him. He and his wife
indicated they understood and that Mr. Hill would comply." The
note does not indicate what those limits were.

On July 26, 2004, plaintiff told his physical therapist that
his right shoulder was feeling better, "no pain", but his right
knee hurt when squatting (Tr. at 124). He rated the pain a 3/10.

On August 9, 2004, plaintiff told his physical therapist
that he was in a lot of pain over the weekend but after he put
ice on his shoulder it "calmed down" (Tr. at 123). "Reports no
pain now."

On August 10, 2004, plaintiff saw Dr. Carter (Tr. at 146).
Dr. Carter noted that plaintiff was "doing satisfactorily with
his shoulder and knee. They are both improving." Plaintiff had
a lot of popping in his knee which is "not unusual with the type
of injury and surgery that he had." His shoulder was getting
stronger, but plaintiff was not yet ready to go back to work.
Dr. Carter recommended that plaintiff minimize squatting,
kneeling, and twisting activities. He said plaintiff could lift
15 pounds with his right arm, and he could increase three to five

15

pounds per week as his strength allowed.  Dr. Carter released
plaintiff to return to work with no restrictions as of September
7, 2004.

On August 31, 2004, plaintiff's physical therapist noted
that plaintiff had a total of eight visits, three of which
included treatment for both the shoulder and the knee (Tr. at
122).  Plaintiff canceled his last appointment.  His discharge
status was "improved."

On September 10, 2004, plaintiff saw Dennis Abernathie,
M.D., at Fitzgibbon Hospital (Tr. at 113, 145).  Plaintiff
complained of low back pain, right shoulder pain, and right knee
pain.  Plaintiff said his back pain was aggravated by lifting
activities.  "[I]nterestingly [he] has myasthenia gravis and he's
on medication for it but he still can get tired fairly quickly
and that may explain why he looks clearly muscular and he may or
may not be although he looks plenty strong."  Plaintiff said that
many years ago, he lifted a steel plate at work and pulled his
back.  He had had a little recurrent back pain ever since.  It
had gotten "a little worse" since he recently had shoulder
surgery and right knee surgery.  Dr. Abernathie reviewed the MRI
of plaintiff's back and concluded that it "really looks pretty
good.  There is only minimal degeneration of the discs so it's
better than would normally be for age.  Clinically he looks very

16

good as well with a straight leg raise that's negative at 80 degrees bilaterally.  Good dorsiflexion, plantar flexion and eversion strength."  Plaintiff was tender on the left side near the sacroiliac joints.  Dr. Abernathie recommended physical therapy to prevent a muscle strain, since plaintiff was going to physical therapy anyway.

On September 15, 2004, plaintiff was to begin physical therapy at Fitzgibbon Hospital for lumbosacral strain (Tr. at 110, 114, 119).  In his initial patient interview, plaintiff was asked to check all conditions that apply, and he did not check "shortness of breath."  He noted that his problem was gradual and the pain began in 1996.  He was asked if there is anything he cannot do because of pain, and he wrote, "running and walking after a while."  He did not indicate a problem with sitting. He was discharged on November 4, 2004, after having attending physical therapy twice (Tr. at 111).  He was supposed to attend two to three times per week.

On September 22, 2004, plaintiff failed to show for an appointment with Dr. Uhrig (Tr. at 96).

On October 1, 2004, plaintiff attended physical therapy at Fitzgibbon Hospital (Tr. at 112).  The doctor noted that plaintiff said his shoulder and knee were doing better.  On one occasion, plaintiff had increased back pain while lying in bed.

17

Plaintiff had full active shoulder motion functionally and could deep knee squat without discomfort. The doctor noted that plaintiff's right leg showed increased instability during leg press exercises. He recommended that plaintiff continue physical therapy. Plaintiff did not receive any medical treatment for the next six months, until his April 5, 2005, visit with Dr. Uhrig.

On October 22, 2004, plaintiff failed to appear for his appointment at the Columbia Orthopaedic Group (Tr. at 144).

On November 4, 2004, plaintiff's physical therapist talked to plaintiff's wife who said plaintiff continued to exercise at home and so far "is doing better." (Tr. at 112). Plaintiff had not returned to work. Plaintiff was discharged from physical therapy as his prescription had expired.

On February 7, 2005, plaintiff filed his application for disability benefits.

On March 29, 2005, N. R. Townley, a DDS physician, completed a Physical Residual Functional Capacity Assessment (Tr. at 152-159). Dr. Townley found that plaintiff could lift 20 pounds occasionally and ten pounds frequently, stand or walk for six hours per day, sit for six hours per day, and had an unlimited ability to push or pull. Dr. Townley found that plaintiff could frequently climb ramps or stairs, balance, stoop, kneel, crouch, or crawl, and could occasionally climb ladders, ropes, and

18

scaffolds. Dr. Townley found that plaintiff was limited to reaching overhead with his right arm only occasionally, had no visual limitations, no communicative limitations, and no environmental limitations except that he should avoid concentrated exposure to vibration.

On April 5, 2005, plaintiff saw Dr. Uhrig for a follow up on his high cholesterol, diabetes, and hypertension (Tr. at 161). Plaintiff denied any chest pain or shortness of breath. He had some minor drooping of the right eyelid. His blood sugar was 228. Dr. Uhrig assessed diabetes mellitus "not well controlled", hyperlipidemia, hypertension "mildly elevated", and gouty arthritis, left first finger joint. Dr. Uhrig prescribed insulin, Zocor for high cholesterol, and Naprosyn (non-steroidal anti-inflammatory) for plaintiff's finger arthritis. "I discussed daily exercise with him and weight loss." Plaintiff did not receive medical care for the next two months.

On June 7, 2005, plaintiff saw Dr. Uhrig for a follow up (Tr. at 163). "He still has some flare up of myasthenia, which effects his breathing, his visual status as well as chewing in that he tires out. He also complaints [sic] of tiring out easily with walking. He still has his usual back pain. No chest pain or SOB [shortness of breath]." Dr. Uhrig's impression was:

1.   Hypertension, stable

2.   Hyperlipidemia doing well with Zocor

3.   Diabetes mellitus doing better, will continue with present dose of insulin, still needs more exercise and weight loss

4.   Gouty arthritis, gave him some Diclofenac (non-steroidal anti-inflammatory) to take as needed.

He recommended plaintiff return in three months for blood work. Plaintiff had no other medical care for the next three months.

On September 15, 2005, plaintiff saw Dr. Uhrig for a follow up (Tr. at 165). "He has had some soreness of the right hip and right knee. No chest pain or shortness of breath. Glucoses are low at times, mainly at night. He has not been real compliant with eating and taking his insulin on time." Plaintiff's LDL cholesterol was somewhat high and his A1c was high, but all other blood work was normal. Dr. Uhrig's impression was:

1.   Diabetes mellitus, slowly doing better

2.   Hyperlipidemia

3.   No recurrence of gout

4.   Depression, stable

5.   Hypertension

20

He recommended plaintiff return in three months for blood work.  Plaintiff had no medical treatment for the next five months.

On February 8, 2006, plaintiff saw Dr. Uhrig for a follow up (Tr. at 167-169).  Plaintiff reported more twitching of his body due to myasthenia gravis "not taking the Mestinon[7], not very active".  Plaintiff denied any change in vision.  He was not attempting to follow a low saturated fat diet and had gained weight.  Plaintiff was not taking the medication for myasthenia gravis.  His hypertension was stable, and he had had no further episodes of gout.  "All systems querried [sic].  Patient denies other symptoms except as noted above."  On exam, plaintiff's respiratory system was normal.  Plaintiff had normal gait, full and painless range of motion of his neck, appropriate judgment and insight.  "Weight loss has been strongly encouraged by following dietary restrictions and an exercise routine."  Dr. Uhrig told plaintiff to start taking his Mestinon for myasthenia gravis and to come back in three months for blood work. Plaintiff had no other medical treatment for the next three

---

[7]Mestinon, used to treat myasthenia gravis, is an orally active cholinesterase inhibitor. Mestinon prevents the breakdown of acetylcholine by allowing more acetylcholine to accumulate. Acetylcholine is the chemical that sends nerve impulses to the muscle. With more acetylcholine, there is more control of voluntary functions such as eye movements, limited strength, swallowing and breathing.

months.

On May 1, 2006, plaintiff saw Dr. Uhrig and complained of back and hip pain (Tr. at 170-171). He said his back pain began two weeks ago. "All systems querried [sic]. Patient denies other symptoms except as noted above." He had right lower paraspinal muscle tenderness but full range of motion, no instability, and normal strength and tone in his spine. He prescribed Ultram (narcotic-like pain reliever) and Diclofenac (non-steroidal anti-inflammatory) for back pain.

On May 12, 2006, plaintiff saw Dr. Uhrig for a follow up (Tr. at 172-174). He reported that his leg and back pain were better. He denied any other symptoms. Dr. Uhrig strongly encouraged weight loss through diet and "an exercise routine." He found that plaintiff's myasthenia gravis without exacerbation was stable. He told plaintiff to return in three months. He had no other medical treatment during the next three months.

On August 16, 2006, plaintiff saw Dr. Uhrig for a follow up (Tr. at 175-177). Plaintiff denied any changes in vision. He reported more drooping of his left upper eyelid. His "thoracic or lumbosacral neuritis or radiculitis" was noted as stable. His respiratory exam and psychiatric exams were normal. Dr. Uhrig assessed "no change" with respect to plaintiff's myasthenia gravis. Plaintiff had no medical treatment during the next three

months.

On November 17, 2006, plaintiff saw Dr. Uhrig for a regular check up (Tr. at 180-182). Plaintiff said he had noticed some shortness of breath on exertion for several weeks. He said he feels tired all the time, has some twitching at night. Plaintiff's exam was normal. Plaintiff had an EKG which was normal, and he had chest x-rays which were normal. Dr. Uhrig collected blood for testing. He strongly encouraged weight loss "by following dietary restrictions and an exercise routine." He found that plaintiff's myasthenia gravis without exacerbation was unchanged. He scheduled plaintiff for a stress echo. Later that day, Dr. Uhrig write a letter to plaintiff to tell him his blood tests were essentially normal, with the exception of his Hemoglobin A1c (Tr. at 179). "The HgbA1c level is elevated, suggesting inadequate diabetic control. Increase your insulin to 80 units twice a day."

On December 12, 2006, plaintiff underwent a stress echo which was normal (Tr. at 184). The report says, "Work on the walking and weight loss. . . . Patient needs more weight loss and exercise; has poor physical conditioning as the cause of patient's DOE [dyspnea, or shortness of breath, on exertion].

On February 27, 2007, plaintiff saw Dr. Uhrig for a follow up (Tr. at 186-188). Plaintiff reported some constipation

related to change in diet. "All systems querried [sic]. Patient denies other symptoms except as noted above. More eyelid drooping recently." On exam Dr. Uhrig observed "bilateral mild ptosis [droopy eyelid]". His respiratory exam was normal. Dr. Uhrig's assessment included myasthenia gravis without exacerbation, and "other dyspnea [shortness of breath] and respiratory abnormalities assessment: The dyspnea has improved – stress test was normal." Plaintiff was told to return in three months.

On March 26, 2007, Dr. Uhrig wrote a letter which states as follows:

> This patient has significant myasthenia gravis. This is a neurologic disorder effecting muscles of the body, particularly the muscles involving the eyes. This patient has marked drooping of both upper eyelids on a fairly constant basis. This causes problems with focusing his vision. This problem continues to persist despite appropriate medication therapy. This type of vision problem would impair all types of work venues."

### C.   SUMMARY OF TESTIMONY

During the April 11, 2007, hearing, plaintiff testified as follows:

At the time of the hearing, plaintiff was 44 years of age and is currently 46 (Tr. at 227). He studied drafting in junior college (Tr. at 227). Plaintiff said he cannot work because he cannot maintain a schedule and he has problems with his voice and his eyesight (Tr. at 228). He cannot maintain a schedule because his ability to sit, stand, and walk varies each day (Tr. at 228).

24

"It's just a part of the disease. Activity -- the more active I am, the worse it gets." (Tr. at 228). His legs and his back cause the problems (Tr. at 228). He gets spasms and cramps (Tr. at 228). On good days, plaintiff can stand for 30 minutes, but other days not even ten or 15 minutes (Tr. at 229). He can sit for 30 minutes on a good day and ten to 15 on a bad day (Tr. at 229). Myasthenia is causing the cramping and the pain because it messes with his muscles (Tr. at 229). Plaintiff has to lie flat on his back on sit in a recliner to relieve his symptoms (Tr. at 229-230). He rests like this four to five hours per day (Tr. at 230).

Plaintiff's hands and forearms lock in place so that he cannot move them (Tr. at 230). Plaintiff's energy level is very low (Tr. at 231). His voice will go out on him if he talks too much (Tr. at 231). Plaintiff has double vision and droopy eyelids (Tr. at 231). The double vision is there all the time (Tr. at 232). This affects plaintiff's balance and he is unable to reach for things because he cannot align himself (Tr. at 232). Dr. Uhrig treats him for this condition (Tr. at 232). Plaintiff testified that he does not drive because he gets nervous and has to watch for traffic and it makes his eyes get worse (Tr. at 232). He then testified that his license is suspended, but he does drive a little bit, just not in town (Tr. at 232). His

25

license has been suspended since 2004 due to DWIs (Tr. at 233).

Plaintiff has trouble sleeping due to his right leg (Tr. at 233). He spends his day listening to the radio or television, and he tries to help his wife a little bit doing chores like washing dishes or cooking (Tr. at 233).

Plaintiff's last day of work was June 11, 2004 (Tr. at 234). He stopped working due to his shoulder surgery (Tr. at 234). Since then he worked part time as a custodian at the YMCA (Tr. at 234). He did that for four months, but he stopped due to a probation violation for driving (Tr. at 234).

## V.  FINDINGS OF THE ALJ

Administrative Law Judge Thomas Muldoon entered his opinion on June 13, 2007 (Tr. at 11-19).

Step one.  The ALJ found that plaintiff has not engaged in substantial gainful activity since his alleged onset date (Tr. at 13). Although plaintiff attempted part-time work after his alleged onset date, the work lasted only four months and did not reach the level of substantial gainful activity (Tr. at 13).

Step two.  Plaintiff has the following severe impairments: Myasthenia gravis, lumbar degenerative disc disease, status post right knee arthroscopy and right shoulder rotator cuff repair, diabetes mellitus, and hypertension (Tr. at 13).  Defendant's depression is nonsevere (Tr. at 13).

26

Step three.  Plaintiff's severe impairments do not meet or equal a listed impairment (Tr. at 13-14).

Step four.  Plaintiff retains the residual functional capacity to lift 20 pounds occasionally and ten pounds frequently, he can sit for six hours a day, and he can walk or stand for two hours per day (Tr. at 14).  With this residual functional capacity, plaintiff cannot return to his past relevant work (Tr. at 18).

Step five.  Because plaintiff can perform the full range of light work[8], and because his additional limitations have little or no effect on the occupational base of unskilled light work, a finding of "not disabled" is appropriate under Medical Vocational Rule 202.21[9] (Tr. at 18).

_____

[8]The ALJ's finding that plaintiff can perform the full range of light work is in error since he found that plaintiff can only walk for two hours per day.  However, the ALJ alternately found that plaintiff could perform the full range of sedentary work which is supported by the residual functional capacity assessment.

[9]A younger individual with a high school diploma or more with previous work experience limited to unskilled work or no previous work experience and who has the ability to perform light work results in a finding of not disabled.  20 C.F.R. § 202.21. "The reader consulting the table referenced above, Rule 202.21, may be confused to find the word 'Do.' instead of 'Not disabled.' 'Do.' is an abbreviation for 'ditto.' U.S. Gov't Printing Office, Style Manual 159 (2000)." Dewey v. Astrue, 509 F.3d 447, 449 n.1 (8th Cir. 2007).  As the defendant points out, the ALJ's correct finding that plaintiff can perform the full range of sedentary work would point to Rule 201.21, not 202.21.  Rule 201.21 is the same as 202.21 except that it includes the maximum ability to perform sedentary work rather than light work.

27

## VI. NONEXERTIONAL IMPAIRMENTS

Plaintiff argues that the ALJ erred in failing to make any findings in regard to plaintiff's pain, shortness of breath, and double vision. These allegations come entirely from plaintiff and are unsupported by the medical records.

<u>Pain</u>. On July 12, 2004, plaintiff told his physical therapist he did not have much pain. On July 26, 2004, plaintiff reported no pain in his shoulder. He had pain in his knee when squatting which he characterized as a 3/10. On August 9, 2004, plaintiff reported that he had had pain in his shoulder once, but he put ice on it and it was fine. On August 9, 2004, he had no pain at all. On October 1, 2004, plaintiff had full active shoulder motion and could deep knee squat without discomfort. On May 1, 2006 -- almost two years after his alleged onset date -- plaintiff reported back pain that began two weeks earlier. Plaintiff was prescribed Ultram, a narcotic-like pain reliever. This is the one and only time plaintiff was ever given anything for pain besides a non-steroidal anti-inflammatory.

<u>Shortness of breath</u>. On June 22, 2004, plaintiff denied shortness of breath. On July 12, 2004, plaintiff denied shortness of breath. On September 15, 2004, plaintiff denied shortness of breath. On April 5, 2005, plaintiff denied shortness of breath. On June 7, 2005, plaintiff denied shortness

Case 4:07-cv-00937-REL   Document 18   Filed 10/10/08   Page 28 of 33

of breath.  On September 15, 2005, plaintiff denied shortness of breath.  On February 8, 2006, plaintiff denied shortness of breath.  On May 1, 2006, plaintiff denied shortness of breath.  On November 17, 2006 -- two years and five months after plaintiff's alleged onset date -- plaintiff "noticed some shortness of breath on exertion for several weeks."  Dr. Uhrig conducted an exam which was normal.  Plaintiff had a stress echo which was normal, and the doctor found that his shortness of breath on exertion was due to poor physical conditioning.  Plaintiff was told to walk and to engage in a regular exercise routine.  On February 27, 2007, plaintiff denied shortness of breath.

Double vision.  There is no evidence that plaintiff ever complained of double vision to any medical professional.  On January 5, 2004, his vision was 20/20 in both eyes with glasses.  No medical form reflects any difficulty with his vision, and plaintiff's daily activities (including driving, albeit with a suspended license) belie his assertion of constant double vision.

On June 24, 2004, Dr. Carter noted that plaintiff was doing satisfactorily with his myasthenia gravis.  On April 5, 2005, Dr. Uhrig noted "some minor drooping of the right eyelid."  However, he did not assess myasthenia gravis, and he did not treat plaintiff for this symptom.  On June 7, 2005, Dr. Uhrig wrote,

"He still has some flare up of myasthenia, which effects his breathing [and] his visual status". However, he did not assess myasthenia gravis, nor did he provide any treatment for these symptoms. On February 8, 2006, plaintiff reported more twitching, but he had not been taking his medication for myasthenia gravis. Plaintiff denied any change in vision. Dr. Uhrig told plaintiff to take the medication that had been prescribed. On May 12, 2006, Dr. Uhrig found that plaintiff's myasthenia gravis without exacerbation was stable. On August 16, 2006, plaintiff denied any changes in vision. Dr. Uhrig assessed "no change" with respect to plaintiff's myasthenia gravis. On November 17, 2006, plaintiff's myasthenia gravis without exacerbation was unchanged. On February 27, 2007, plaintiff reported "more eyelid drooping recently." Dr. Uhrig assessed myasthenia gravis without exacerbation. He did not change anything about plaintiff's treatment.

In addition to the above notations from the medical records, plaintiff's daily activities, the lack of restrictions from his doctors, and the constant recommendations to engage in regular exercise support the ALJ's finding with regard to these alleged nonexertional impairments.

Plaintiff reported that he is able to prepare complete meals, he can cook for one to two hours at a time, he does

laundry, does household repairs, mows, does dishes, shops for groceries for 30 to 60 minutes at a time, drives, and is able to go out alone. He watches television and plays video games daily. He can walk 1/2 to one mile before needing to rest. In his March 10, 2005, Function Report, he did not indicate any difficulty with standing or sitting. On September 15, 2004, plaintiff indicated that only running and walking "after a while" cause pain.

When plaintiff had his shoulder surgery, his doctor believed he could get back to work (Tr. at 149-151). He told plaintiff he would need about three to four months of therapy after his surgery. On August 10, 2004, Dr. Carter told plaintiff he was limited to lifting 15 pounds with his right arm but he could increase three to five pounds per week. He released plaintiff to return to work with no restrictions as of September 7, 2004 -- about 2 1/2 months after plaintiff's alleged onset date.

On September 10, 2004, Dr. Abernathie reviewed the MRI of plaintiff's back and concluded that it was better than normal for plaintiff's age. "Clinically he looks very good." On April 5, 2005, Dr. Uhrig told plaintiff to exercise daily. On June 7, 2005, Dr. Uhrig said plaintiff "still needs more exercise." On February 8, 2006, Dr. Uhrig strongly encouraged an exercise routine. On May 12, 2006, Dr. Uhrig strongly recommended an

31

exercise routine.  On November 17, 2006, Dr. Uhrig strongly recommended an exercise routine.  On December 12, 2006, plaintiff was told to work on the walking, that he needed more exercise.

Finally, I note that although plaintiff did not raise the ALJ's credibility finding as an issue, it is related to this argument as the nonexertional impairments are all subjective. Plaintiff testified at the hearing that he gets spasms and cramps; however, he never complained of spasms or cramps to any doctor or physical therapist, and no medical professional ever found spasms or cramps on exam.

Plaintiff testified that his hands and forearms lock in place so that he cannot move them; however, he never made this complaint to any doctor or physical therapist, and no one ever found such a condition.

Plaintiff testified that his voice will go out on him if he talks too much.  Plaintiff never made this complaint to any doctor or physical therapist, and no one ever observed that plaintiff had trouble with his voice.

Plaintiff testified that his double vision affects his balance and that he is unable to reach for things because he cannot align himself.  Plaintiff never made these complaints to any doctor or physical therapist, and no one ever observed any problems with plaintiff's balance, his ability to reach, or his

32

ability to align himself after moving parts of his body.

Plaintiff's allegations are not credible, and the medical records do not in any way support his allegations of severe non-exertional impairments. Therefore, the ALJ did not err in failing to consider plaintiff's nonexertional impairments of pain, double vision, or shortness of breath. Because the ALJ properly found that plaintiff can perform a full range of sedentary work, is a younger individual, has a high school diploma or more, and his nonexertional impairments do not limit his ability to perform a full range of sedentary work, the ALJ did not err in failing to utilize the services of a vocational expert.

## VII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

*/s/ Robert E. Larsen*
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
October 10, 2008

33